# SUPREME COURT,

AT THE

## AUGUST TERM, 1884.

PRESENT:

Hon. DECIUS S. WADE, Chief Justice.
Hon. WM. J. GALBRAITH, } Associate Justices.
Hon. JOHN COBURN,

---

TERRITORY OF MONTANA, respondent, *v.* CARL J. ADOLF-SON, appellant.

CONVICTION OF MURDER — *Testimony required* — *Insufficient proof.*— A conviction of murder, arrived at through testimony of a single witness, which is substantially contradicted by other witnesses, and itself contradictory of evidence formerly given by the same witness before the coroner, may be set aside, as such testimony cannot convince to a moral certainty, which is the certainty required in a criminal case.

*Appeal from First District, Gallatin County.*

J. J. DAVIS, for appellant.

J. A. JOHNSTON, Attorney-General, for respondent.

GALBRAITH, J. The defendant was indicted for and convicted of the crime of murder in the first degree for the killing of one Andrew Sjobeirg. The testimony in

the case shows that on the night of the 4th of February, 1883, being the night upon which the homicide is alleged to have been committed, the deceased, the defendant, and two other persons, Peterson and Johansen, slept in a shanty in Rocky canon, Gallatin county. The evening previous to the homicide, Johansen and the defendant were quarreling with the deceased. It would appear that the defendant and Johansen were the assailants. Johansen's enmity to the deceased would appear from the testimony to have arisen on account of a previous trouble which had taken place between the deceased and Johansen's brother, and defendant's cause of quarrel was in relation to a settlement of an indebtedness claimed to be due from deceased to defendant and Peterson. Johansen struck the defendant two or three times with his hand. When the deceased attempted to leave the cabin, the defendant threw him back into the cabin two or three times. During this altercation the defendant remarked that he (the defendant) would make " his pain short before morning." But the witness who testified to this threat did not know at the time to whom it referred, but supposed afterwards that it referred to the deceased. Johansen also remarked, on the day previous to the homicide, in a conversation relating to the deceased, "If he comes back again to-night, I'll fix him." They went to bed about 10 o'clock at night; Johansen and the defendant sleeping in the same bed, and the deceased and Peterson sleeping in separate beds. The only witness who connected the defendant with the homicide was Peterson. He testified that about 2 or 3 o'clock at night the deceased got up and went outside, being gone two or three minutes; that while he was out the defendant got up and lit the candle. The deceased, when he returned, blew it out, and went to bed. The defendant went back to his own bed, and after the deceased laid a little while, he asked the defendant to "come and put the blankets on him," and then the defendant went

up and took hold of the blankets and shook them around
a little, and then "I saw he had a knife in his hand, and
cut the deceased in the neck. He cut him right on the
left side of the neck. He only cut him one time. I was
laying in bed, and Johansen was in bed, and after he
cut him the defendant went back to his bed. There was
no light in the house, but the deceased was laying right
beside the window, and I heard the blood running. In
the morning I saw the blood, and told the defendant to
come and look, and he reached over and took the knife
that was lying inside the mat between him and the wall,
and said: "Now you see this scrub; that the knife
belonged to the deceased, and has laid there and cut him-
self.'" The witness Peterson also testified that the de-
ceased, a very short time before he died, which was about
7 o'clock in the morning, asked for a cup of coffee; that
the night upon which the homicide was committed was a
moonshiny night, and that at 10 o'clock the moon was
about mid-heaven, and was shining brightly, so that he
could see plainly in the house, though the door was shut.
He also testified that he made no statement to the coroner
at the cabin, and was not examined, and did not testify for
fear of the defendant. In answer to the question, "Do you
know how this man was killed?" he said he thought he
was killed, but did not say by whom. He admitted that
he told the coroner, the next day after the homicide, that
the deceased had committed suicide, and that he so testi-
fied before the coroner's jury. He also testified that he
did not say before the coroner's jury that he "did not
know whose knife it was with the blood on it." The
bunk upon which the deceased lay when the homicide
was committed was about three feet from the window,
which contained four small lights of glass. Two knives
were found in the bunk where the deceased slept; one
was open, and the big blade and the knife was all bloody.
The other knife was not bloody. The surgeon testified
that he found a wound in the throat of the deceased

about three and a half or four inches in length, and two and a half or three inches in depth, severing the windpipe, the jugular vein and the carotid artery, and that, in his opinion, he died from hemorrhage from the wound in his neck, and that a person who had received such a wound could not possibly live over thirty minutes; also, that it would be impossible for a man, after laying three or four hours with such a wound, to articulate. The evidence showed that, at 2 o'clock P. M. the next day after the homicide, it was so dark in the cabin, with the door open, that a candle had to be lighted to remove the corpse.

A witness testified as follows: "We went into the cabin first, and had to light to see." Another witness testified as follows: "I went into the cabin, and the room was so dark I couldn't see who it was. It might have been a negro, and I wouldn't have known the difference." It was shown by the testimony that the moon would not be visible on the night of the alleged homicide in that locality until nearly 6 o'clock in the morning. The coroner testified that the witness Peterson was asked before the coroner's jury whose knife it was that had the blade open, and he answered that he did not know; that Peterson said at the cabin that the man had committed suicide, and that this statement was made by him before the coroner's jury two or three times, and that he repeated the assertion after being arrested.

It appears from the above evidence, therefore, that Peterson, who alone testified to the fact of the killing, is contradicted by his statement made out of court at different times within two or three days after the homicide, and also by the testimony before the coroner's jury, under oath, wherein he also stated that the deceased had committed suicide. The testimony of the witness as to his seeing the act of killing is rendered improbable in view of that portion of the evidence which shows that in the day-time the cabin was so dark that a witness

could not distinguish a man in it, so as to determine whether he was white or black, and that the coroner and his jury were compelled to light a candle to see where the deceased was lying. The weight of the testimony of this witness is also seriously affected in that he testified that the deceased was wounded about 2 or 3 o'clock at night, and was alive about 7 o'clock the next morning, and asked for a cup of coffee, while the evidence of the surgeon shows that, in his opinion, a person with such a wound could not possibly live over thirty minutes, and that it would be impossible for a man, after lying three or four hours with such a wound, to articulate. His testimony that the night upon which the alleged homicide took place " was a moonshiny night," and that, at 10 o'clock, " the moon was about mid-heaven," and was shining brightly, so that he could see plainly in the house, though the door was shut, is contradicted by the evidence, which shows that, upon that night, the moon was invisible, and did not rise until between 5 and 6 o'clock in the morning. He was also contradicted in relation to his statement in his examination, that the knife belonged to the deceased, by his testimony before the coroner's jury that he did not know to whom the knife belonged. Under this contradictory and improbable state of the testimony of this witness, who alone testified to the act of killing, and connected the defendant with the homicide, we cannot say that the testimony excludes every reasonable doubt as to the guilt of the defendant. Such testimony cannot convince to a moral certainty, which is the certainty required in a criminal case.

The judgment is reversed and the cause remanded for a new trial.

*Judgment reversed.*

(All the judges concur.)